IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

_____

No. 23-416

_____

**FILED**

**November 13, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* D.H., M.H., and J.S.

_____

Appeal from the Circuit Court of Berkeley County
The Honorable Bridget Cohee, Judge
Juvenile Action Nos. CC-02-2022-JA-124, CC-02-2022-JA-125,
and CC-02-2022-JA-126

AFFIRMED

_____

Submitted: October 23, 2024
Filed: November 13, 2024

Christian J. Riddell, Esq.
Riddell Law Group
Martinsburg, West Virginia
Attorney for the Petitioner Mother

Catherine Bond Wallace, Esq.
Zoey Vilasuso, Esq.
ChildLaw Services, Inc.
Martinsburg, West Virginia
Guardians ad Litem for the Minor
Children, D.H., M.H., and J.S.

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee Niezgoda, Esq.
Assistant Attorney General
Fairmont, West Virginia
Attorneys for the Respondent
Department of Human Services

Debbie Flowers Payne, Esq.
Law Office of Debbie Flowers Payne
Martinsburg, West Virginia
Attorney for the Respondent Father

JUSTICE BUNN delivered the Opinion of the Court.

JUSTICE WOOTON dissents and may write separately.

**SYLLABUS BY THE COURT**

1.      "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

3.      "'The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.' Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995)." Syllabus point 3, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014).

4.      "Where there is a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government, this violates the separation of powers doctrine contained in Section 1 of Article V of the West Virginia Constitution." Syllabus point 2, *Appalachian Power Co. v. Public Service Commission of West Virginia*, 170 W. Va. 757, 296 S.E.2d 887 (1982).

5.      "Under [West Virginia Rule of Evidence] 702, a trial judge has broad discretion to decide whether expert testimony should be admitted, and where the evidence is unnecessary, cumulative, confusing[,] or misleading the trial judge may properly refuse to admit it." Syllabus point 4, *Rozas v. Rozas*, 176 W. Va. 235, 342 S.E.2d 201 (1986).

**BUNN, Justice:**

The petitioner, T.S.[1] ("Mother"), appeals to this Court from the Circuit Court of Berkeley County's June 26, 2023 dispositional order terminating her parental rights to her children D.H., M.H., and J.S. Mother's assignments of error are without merit because the circuit court was authorized to order the West Virginia Department of Human Services ("DHS")[2] to join the prosecution of the underlying abuse and neglect case; and further, it did not err in denying Mother's motion to hire an expert, finding the allegations of abuse and neglect were proven by clear and convincing evidence, and ultimately terminating Mother's parental rights.

**I.**

**FACTUAL AND PROCEDURAL HISTORY**

Prior to the abuse and neglect proceeding at issue, the DHS received multiple referrals over a period of years regarding allegations of abuse and neglect against Mother. Child Protective Services ("CPS") investigated those referrals, but the DHS did not file a petition at that time because it failed to substantiate the allegations. D.H. and M.H.'s father

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[2] Pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

("Father") subsequently instituted an action in family court for a protective order after M.H. disclosed sexual abuse that purportedly occurred in Mother's home. The family court then referred the matter to circuit court pursuant to Rule 48 of the Rules of Practice and Procedure for Family Courts.[3] The circuit court initiated an administrative action to investigate the claims and appointed the children a guardian ad litem ("GAL").

In August 2022, before the administrative action concluded, Father, with the assistance of counsel, filed an abuse and neglect petition in the same circuit court alleging that Mother physically abused the children, allowed others to abuse the children, engaged in domestic violence with a boyfriend in the presence of the children, and engaged in substance abuse affecting her parenting ability.[4] The children's GAL joined the petition. According to the petition, the family court set a custody schedule giving Father primary custody, while Mother had visitation of D.H. and M.H. every other weekend. Father

---

[3] Rule 48 of the Rules of Practice and Procedure for Family Courts requires a family court to report "suspected abuse or neglect to the state child protective services agency, pursuant to W. Va. Code §§ 49-6A-2 [sic], and the circuit court" when the family court has "reasonable cause to suspect any minor child involved in family court proceedings has been abused or neglected[.]"

[4] The petition also named T.C., the alleged biological father of J.S., and W.C., Mother's then boyfriend, as respondents. In an update to this Court, the DHS indicated that T.C. failed to appear, and his paternity of the child could not be confirmed. Accordingly, the DHS amended the abuse and neglect petition to include the unknown father of J.S. This amended petition is not included in the record before us. The circuit court ultimately terminated J.S.'s unknown father's parental rights on July 23, 2023.

contended that D.H. and M.H. returned to his home with bruises after spending time with Mother. The children explained that Mother and her boyfriend, W.C., repeatedly hit them with belts. In a forensic interview with the Child Advocacy Center, M.H., then seven years old, disclosed that Mother threatened to physically harm her, allowed inappropriate people in the home, failed to care for J.S., and allowed W.C. to physically harm her. D.H., then eleven years old, reported in a forensic interview that Mother engaged in substance abuse, harmed him physically, threatened to harm him physically, failed to keep sufficient food in the home, and failed to care for J.S. D.H. revealed a time when Mother took him with her to a "sketchy alley" to "buy weed" and he also indicated that marijuana and drug paraphernalia were in her home.

On August 16, 2022, the court held a preliminary hearing. In the following order, the court stated that it had "previously ordered [the DHS] to join in the petition and [had] noted [the DHS's] objection on the record."[5] The court further found that "[i]t was appropriate for [Father and GAL] to . . . file the petition based upon the allegations of [Mother's] abuse and neglect of the children."

---

[5] Neither party included in the record on appeal the hearing transcript where this exchange occurred.

3

Throughout the proceedings, Mother questioned the veracity of the children, contending they were coached to make their disclosures. She particularly questioned the veracity of D.H.'s complaints, stating he had a propensity to exaggerate and lie. On September 21, 2022, Mother filed a motion requesting public funding for an expert witness to review the children's forensic interviews for signs of coaching or other indicia of unreliability. Following additional briefing and a hearing in December 2022, the court issued an order denying Mother's motion for public funding and further denied her permission to hire an expert to independently review the forensic interviews. The court explained that Mother's suggested expert was not trained in the Child First Protocol used by forensic interviewers and found that the suggested expert "would not be helpful to the [c]ourt and goes outside of the purpose of forensic interviews of children."

The GAL submitted a Birth to Three referral for J.S. "due to significant delays and concerns reported by his caregivers."[6] On October 27, 2022, the GAL filed Birth to Three evaluations with the court demonstrating that J.S. had twenty-five to forty percent delays in every category of development and that he suffered partial hearing loss. Prior to the adjudicatory hearing, the circuit court conducted in camera interviews with D.H. and M.H.

---

[6] "West Virginia Birth to Three is an early intervention program that partners with families and caregivers to build upon their strengths by offering coordination, supports [sic], and resources to enhance children's learning and development." *In re N.H.*, No. 17-0358, 2017 WL 3868015, at *1 n.3 (W. Va. Sept. 5, 2017) (memorandum decision).

The court conducted several evidentiary hearings related to Mother's adjudication and a final adjudicatory hearing in March 2023. At the start of the adjudicatory hearings, the court informed the parties that it had conducted in camera interviews with D.H. and M.H. and concluded that their in camera disclosures were consistent with their previous forensic interviews.[7] The DHS informed the court that it was a co-petitioner but deferred the lead questioning to Father and the GAL. The DHS took part in questioning the witnesses and submitted exhibits for admission into evidence.

During the adjudicatory hearings, Father testified and recounted the events that led to his filing of the petition, including disclosures from D.H. that Mother physically harmed D.H., failed to provide sufficient food, engaged in substance abuse, and allowed inappropriate people into the home. Mother also testified and denied many of the allegations in the petition. Mother did admit during her testimony that she previously pled guilty to reckless driving after law enforcement stopped her for driving more than 100 miles per hour with J.S. in the vehicle and that she allowed W.C., a known drug addict, around her children. However, she repeatedly testified that she did not abuse or neglect her children. Mother insisted that D.H. and M.H. lied or were coached regarding the disclosures made to the court and in their forensic interviews. The maternal grandmother

---

[7] Consistent with the allegations in the petition, D.H. and M.H. informed the court that Mother threatened physical abuse, engaged in physical abuse, abused substances, failed to care for J.S., and allowed others in the home to abuse the children.

testified that Mother took excellent care of J.S. and that Mother and D.H. had a good relationship.

The court heard testimony from D.H.'s therapist who opined that since the court removed D.H. from Mother's care, D.H. had been happier and less stressed, and his behavioral issues had decreased. The children's forensic interviewer stated that D.H. and M.H. disclosed allegations of Mother threatening physical abuse, engaging in physical abuse, abusing substances, failing to care for J.S., and allowing others in the home to physically abuse the children. The DHS caseworker who removed J.S. from Mother's home testified that when she removed J.S. he was "not . . . the cleanest" and was hungry. The DHS caseworker who conducted the initial investigation and that worker's supervisor also provided testimony. The DHS supervisor essentially conceded that the initial investigation was not conducted fully. Another DHS supervisor testified that the DHS no longer resisted pursing the case based on what it had learned.

At the conclusion of the case-in-chief, Mother moved to dismiss the abuse and neglect petition arguing that the circuit court's order directing the DHS to join the petition violated Supreme Court cases and that the DHS did not choose to prosecute this case and had given over prosecution of the case to Father and the GAL. In response, the DHS argued that it "participated in each and every phase of this proceeding[,]" including multidisciplinary team meetings and hearings. The DHS further asserted that it believed it

6

"technically prosecuted the case." The GAL also contended that the DHS was involved throughout the prosecution of this case and that the GAL, Father's counsel, and the prosecutor consulted via email and in person prior to every hearing to strategize.

The circuit court denied the motion to dismiss the petition in an order explaining that the law relied on by Mother was inapplicable under the circumstances of this case. The court further found that D.H. and M.H.'s forensic interviews were credible and there was no evidence of coaching. Ultimately, the court found that Mother abused and neglected the children due to her substance use and its effect on her parenting ability, failure to protect the children from inappropriate individuals in the home, excessive corporal punishment, and failure to provide for the children's basic needs. Therefore, the court adjudicated Mother as an abusing and neglecting parent and found the children to be abused and neglected. Mother filed a motion for a post-adjudicatory improvement period.

The circuit court proceeded to disposition and held a hearing on June 16, 2023, where it also considered Mother's motion for a post-adjudicatory improvement period.[8] Both DHS and the GAL supported termination of Mother's parental rights. The court found that Mother was not likely to participate in an improvement period because Mother continued to deny that she abused and neglected her children and maintained that

---

[8] The parties did not include the dispositional hearing transcript in the record on appeal.

no aspect of her parenting needed to be corrected. The court terminated Mother's parental

rights, explaining that there was no reasonable likelihood that the conditions of abuse or

neglect could be substantially corrected in the near future and that reunification would not

be in the children's best interests. Mother now appeals.

## II.

## STANDARD OF REVIEW

We review a circuit court's factual determinations and legal conclusions in

an abuse and neglect case pursuant to the following well-established standard:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In Int. of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). Furthermore,

"[w]here the issue on an appeal from the circuit court is clearly a question of law or

involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1,

*Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). Finally, we have

held that

> "The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995).

Syl. pt. 3, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014).

## III.

## DISCUSSION

Mother asserts that the circuit court committed reversible error by (1) ordering the DHS, after its objection, to prosecute the abuse and neglect case; (2) refusing to allow Mother to hire an expert to review the forensic interviews of the children for signs of coaching or other indicia of unreliability; (3) finding the allegations of abuse and neglect had been proven by clear and convincing evidence; and (4) terminating Mother's parental rights. We address each of these assignments of error in turn and conclude that the circuit court did not err.

9

### A. *DHS Ordered to Join in the Abuse and Neglect Petition*

Mother contends that the DHS investigated the allegations, elected not to file an abuse and neglect petition, and objected to joining in Father's petition. Therefore, Mother argues that the circuit court violated the separation of powers doctrine of the West Virginia Constitution by stepping into the role of the executive branch when it ordered the DHS to join the petition. We disagree.

Pursuant to the West Virginia Constitution, "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" W. Va. Const. art. V, § 1, in part. In other words, "[w]here there is a direct and fundamental encroachment by one branch of government into the traditional powers of another branch of government, this violates the separation of powers doctrine contained in Section 1 of Article V of the West Virginia Constitution." Syl. pt. 2, *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 170 W. Va. 757, 296 S.E.2d 887 (1982). This Court has never "hesitated to utilize the doctrine" to curtail government actions which violate it. *Id.* at 759, 296 S.E.2d at 889.

On the other hand, this Court "has long recognized that it is not possible that division of power among the three branches of government be so precise and exact that there is no overlapping whatsoever." *State ex rel. Sahley v. Thompson*, 151 W. Va. 336, 341, 151 S.E.2d 870, 873 (1966), *overruled on other grounds by State ex rel. Hill v. Smith*,

10

172 W. Va. 413, 305 S.E.2d 771 (1983); *see also Appalachian Power Co.*, 170 W. Va. at 759, 296 S.E.2d at 889 ("[W]e have recognized the need for some flexibility in interpreting the separation of powers doctrine in order to meet the realities of modern day government."). Accordingly, "the doctrine of separation of powers does not seek to achieve a complete divorce between the branches of government[.]" *In re D.S.*, 763 N.E.2d 251, 262 (Ill. 2001), *as modified on denial of reh'g* (Feb. 4, 2002). "Inevitably, there are areas in which separate spheres of governmental authority overlap and certain functions are thereby shared. Such an overlap of governmental authority does not contravene the separation of powers doctrine." *Id.* This overlap is often necessary in abuse and neglect proceedings, where there are concurrent obligations to protect the best interest of the children involved. *See, e.g.*, *id.* at 262-63 ("[D]ue to the unique nature of abuse, neglect[,] and dependency proceedings . . . both the State's Attorney and the circuit court have concurrent obligations to protect the best interests of the minor.").

While this Court has not considered whether a circuit court may order the DHS to join in an abuse and neglect petition filed by someone other than the DHS, at least one other jurisdiction has examined a similar question. In *In re J.J.*, the Illinois Supreme Court held that the separation of powers doctrine does not preclude a court from hearing and deciding the merits of the State's motion to dismiss a petition filed pursuant to the Juvenile Court Act alleging abuse of a minor. 566 N.E.2d 1345, 1348-49 (Ill. 1991). In other words, even when the State chooses to dismiss a petition alleging abuse and/or

11

neglect of a minor, the circuit court has a duty to examine the merits and determine whether the best interests of the children involved are served by the dismissal. *Id.* In reaching this conclusion, the court explained that under the applicable statutory provisions, both the court and the prosecuting attorney "are charged with acting in the best interests of the minor."[9] *Id.* at 1349.

Similarly, the West Virginia abuse and neglect statutory scheme provides for intersecting obligations of the executive and the judiciary branches. This Court has explained that the doctrine of *parens patriae* affords the State certain rights and obligations in the abuse and neglect context,

> "[t]he doctrine of *[p]arens patriae*, subsisting since feudal times and well documented in the common law of England, Virginia, and this State, accords the State rights just below that

---

[9] The court further indicated that because the State's prosecuting attorney has "exclusive executive discretion in the initiation and management of criminal litigation does not require a different result." *In re J.J.*, 566 N.E.2d 1345, 1348 (Ill. 1991). It reasoned that "neglect proceedings brought pursuant to the Juvenile Court Act are civil, not criminal, actions." *Id.* at 1348. Accordingly, the court found that the

> overriding purpose of the Juvenile Court Act is to ensure that the best interests of the minor, the minor's family, and the community are served. . . . [N]ot only the court but the State's Attorney is bound to act in furtherance of this purpose. . . . [I]n dependency and neglect proceedings, . . . both the State's Attorney and the court are charged with the duty of ensuring that, at each step of the wardship adjudication process, the best interests of the minor, the minor's family[,] and the community are served.

*Id.* at 1349.

12

of the natural parent in the health and welfare of minor children. For the protection of the child, the State has always moved expeditiously and decisively when a natural parent has been proved to be unfit to continue the trust of raising his child, when a child has been abandoned by his natural parent or when the parent, by agreement or otherwise, has permanently transferred, relinquished[,] or surrendered the custody of such natural child."

*In re A.G.*, 247 W. Va. 249, 253-54, 878 S.E.2d 744, 748-49 (2022) (emphasis omitted) (quoting *In re Willis*, 157 W. Va. 225, 238, 207 S.E.2d 129, 137 (1973)). This *parens patriae* interest rests with both the judicial and the executive branches. For example, the judiciary has an "obligation to consider the 'best interests of the child [as] paramount.'" *State ex rel. Paul B. v. Hill*, 201 W. Va. 248, 257, 496 S.E.2d 198, 207 (1997) (quoting *In re Jeffrey R.L.*, 190 W. Va. 24, 32, 435 S.E.2d 162, 170 (1993)). Furthermore, "[t]his judicial duty has also been characterized as a *parens patriae* role: '[t]his Court cannot . . . ignore its *parens patriae* duty to protect the best interests of [the child].'" *Paul B.*, 201 W. Va. at 257, 496 S.E.2d at 207 (first alteration added) (citation omitted). Regarding the executive branch's similar interest, this Court has held that an abuse and neglect "action is pursued solely on behalf of the State of West Virginia in its role as *parens patriae*." Syl. pt. 5, in part, *In re B.C.*, 233 W. Va. 130, 755 S.E.2d 664 (2014).[10] Therefore,

---

[10] In support of her position, Mother relies on this Court's decision in *In re B.C.*, 233 W. Va. 130, 755 S.E.2d 664 (2014). Her reliance is misplaced. The issue before the Court in *In re B.C.* was entirely different than the issue before us now. *In Re B.C.* focused on whether a petition for a domestic violence protective order under West Virginia Code § 48-27-101 *et seq.*, and a petition alleging abuse and/or neglect under West Virginia Code § 49-6-1 *et seq.*, "may be filed upon the same facts without consequences" under the doctrines of res judicata or collateral estoppel. Syl. pt. 6, in part, *In re B.C.*, 233 W. Va.

13

both the judiciary and the executive branch have an obligation to act in the best interests of children.

Moreover, the specific abuse and neglect statutes at issue indicate that overlapping obligations exist between the judicial and executive branches. West Virginia Code § 49-4-601(a) makes it clear that either the DHS or a reputable person may file an abuse and neglect petition.[11] *See also In re Willis*, 157 W. Va. at 238, 207 S.E.2d at 137 ("Our statutes providing for the welfare of children establish a mechanism whereby the courts may adjudicate questions arising when the State or a citizen thereof believes there is necessity to change the custodial relationship of natural parent and child because of some dereliction on the part of the parent or the child.").[12] Once the petition is filed by either

130, 755 S.E.2d 664. *In re B.C.* merely clarified that the DHS is a distinct and separate party from any reputable person who files an abuse and neglect petition and that a reputable person is not represented by the prosecuting attorney.

[11] West Virginia Code § 49-4-601(a) provides that

[i]f the department or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides, or if the petition is being brought by the department, in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred, or to the judge of the court in vacation. Under no circumstance may a party file a petition in more than one county based on the same set of facts.

[12] This Court has explained the reasoning behind this statutory framework allowing the State or "a reputable person" to file a petition:

14

DHS or "a reputable person," West Virginia Code § 49-4-601(c) requires the court to "set a time and place for a hearing" and "appoint counsel for the child." Subsection (d) of this same provision provides that "[a]t the time of the institution of any proceeding under this article, the department shall provide supportive services in an effort to remedy circumstances detrimental to a child." The Legislature has, therefore, determined that an abuse and neglect petition may be initiated by an individual who is not a part of the DHS, the DHS must be a part of the proceedings, and the courts must hold an initial hearing on the petition and take further action and make certain decisions as warranted by the facts of the case.[13] *See In re George Glen B., Jr.*, 207 W. Va. 346, 355, 532 S.E.2d 64, 73 (2000) ("[C]ircuit courts are statutorily charged with promptly ruling upon the merits of an abuse and neglect petition, *W. Va. Code*, 49-6-2 [1996] [now W. Va. § 49-4-601], and if abuse or

> [b]y permitting an individual who believes that abuse and/or neglect is occurring, or has occurred, to file a petition alleging such circumstances, and by requiring this person to also have sufficient knowledge of the facts underlying this belief to verify the petition, the statutory framework attempts to protect parents, custodians, guardians, and care givers from unsubstantiated charges while permitting the filing of petitions seeking to protect the health, safety, and well-being of children.

*State ex rel. Paul B. v. Hill*, 201 W. Va. 248, 256, 496 S.E.2d 198, 206 (1997).

[13] As we have previously explained, the Legislature "adopted our abuse, neglect[,] and child welfare statutes in 1915 as a way to afford special protection to persons of tender years, and crafted those statutes as an obvious expression of our lawmakers to join the then modern sociological trend by the codification of the doctrine of *parens patriae*." *In re B.C.*, 233 W. Va. at 137, 755 S.E.2d at 671 (quotations and citation omitted).

15

neglect is found, crafting a disposition to achieve an appropriate placement of an abused and/or neglected child. *W. Va. Code*, 49-6-5 [1998] [now W. Va. § 49-4-604].).[14]

Considering our prior recognition of the role of the State and the court as *parens patriae* as well as the statutory framework laying out mutual obligations on behalf of both to move expeditiously towards the same goal of the best interest of the children, we find that our abuse and neglect statutory scheme provides for corollary obligations of the judiciary and the executive branch to protect the best interest of the children involved in an abuse and neglect proceeding. For these reasons, the circuit court did not violate the separation of powers doctrine by ordering the DHS to join in the abuse and neglect petition filed by Father and joined by the GAL in this case, and therefore, did not err.[15]

---

[14] The guardian ad litem also proffers that the Child Protective Services Policy handbook, revised by the DHS, provides guidance for this situation:

> "[w]henever someone other than DHHR files a petition, the Circuit Court may order CPS to complete an initial assessment or be a party to the petition. . . . If an initial assessment is not ordered but the judge rules that CPS be a party to the proceeding, the child welfare worker must adhere to the court order and follow applicable CPS and Foster Care Policies."

[15] This Court has recognized that the DHS is required to prosecute abuse and neglect proceedings when the initial petition is filed by a reputable person. In *In re Emily G.*, Emily G.'s grandparents filed an abuse and neglect petition pursuant to the reputable person provision against the child's parents. 224 W. Va. 390, 393, 686 S.E.2d 41, 44 (2009) (per curiam). The circuit court dismissed the petition without holding a preliminary hearing or conducting any proceeding. *Id.* at 396, 686 S.E.2d at 47. This Court reversed and directed that the circuit court, at the very least, conduct a preliminary hearing. *Id.* We further directed that the circuit court should "ensure that the other requirements of W. Va.

16

### B. *Mother's Motion to Hire an Expert*

Mother next asserts that the circuit court erred by refusing to allow her to hire an expert to review the forensic interviews of the children for signs of coaching or other indicia of unreliability. Mother contends that her due process rights to meaningfully participate in the abuse and neglect proceeding, including the right to present witnesses, were violated by the court's ruling.[16] We find that the circuit court did not err.

Generally, West Virginia Rule of Evidence 702 "provides for the admission of expert testimony . . . when the expert's 'knowledge will assist the trier of fact . . . to determine a fact in issue.' It does not require the admission of all proffered expert testimony." *Rozas v. Rozas*, 176 W. Va. 235, 240, 342 S.E.2d 201, 206 (1986) (quoting W. Va. R. Evid. 702).[17] Accordingly, we have held that "[u]nder [West Virginia Rule of

---

Code § 49-6-1 [now W. Va. Code § 49-4-601] have been complied with, particularly the statutory directives requiring participation by the [DHS.]" *In re Emily G.*, 224 W. Va. at 396, 686 S.E.2d at 47.

[16] *See* W. Va. Code § 49-4-601(h) (explaining, in part, that "In any proceeding pursuant to this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses.").

[17] West Virginia Code § 49-4-601(k) provides that "[t]he rules of evidence apply" to abuse and neglect proceedings. *See also* W. Va. Code § 49-4-603(a)(1) ("At any time during proceedings under this article the court may, upon its own motion or upon motion of the child or other parties, order the child or other parties to be examined by a physician, psychologist[,] or psychiatrist, and may require testimony from the expert, subject to cross-examination and the rules of evidence."); W. Va. R. Evid 101 (clarifying that the Rules of Evidence apply to proceedings as set out in Rule 1101, and giving effect

17

Evidence] 702, a trial judge has broad discretion to decide whether expert testimony should be admitted, and where the evidence is unnecessary, cumulative, confusing[,] or misleading the trial judge may properly refuse to admit it." Syl. pt. 4, *Rozas*, 176 W. Va. 235, 342 S.E.2d 201.

Moreover, in the criminal context, this Court has found that an expert witness may not make credibility determinations because that task lies in the sole province of the jury:

> Credibility determinations may not be provided by an expert. *State v. Martin*, 224 W. Va. 577, 582, 687 S.E.2d 360, 365 (2009) (per curiam). "'The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses.' Syl. Pt. 2, *State v. Bailey*, 151 W. Va. 796, 155 S.E.2d 850 (1967)." Syl. pt. 2, *Martin*, 224 W. Va. 577, 687 S.E.2d 360. . . . As stated in *Martin*, expert testimony regarding credibility "invade[s] the province of the jury." *Id.* There is nothing in the record to find error on the part of the circuit court by excluding expert testimony relating to [the defendant's] credibility.

*State v. Delorenzo*, 247 W. Va. 707, 716-17, 885 S.E.2d 645, 654-55 (2022).[18]

to evidentiary rules set out in any West Virginia statute so long as statutory rule does not conflict with Rules of Evidence); W. Va. R. Evid 1011 (confirming applicability of Rules of Evidence to abuse and neglect proceedings by not excluding them from scope of Rules).

[18] *See also* Syl. pt. 7, *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990) ("Expert psychological testimony is permissible in cases involving incidents of child sexual abuse and an expert may state an opinion as to whether the child comports with the psychological and behavioral profile of a child sexual abuse victim, and may offer an opinion based on objective findings that the child has been sexually abused. Such an expert may not give an opinion as to whether he personally believes the child, nor an

Similarly, in the context of an abuse and neglect proceeding, because the matter is tried without a jury, "the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected." Syl. pt. 1, in part, *In Int. Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177. In other words, "in the context of abuse and neglect proceedings, the circuit court is the entity charged with weighing the credibility of witnesses and rendering findings of fact." *In re Emily B.*, 208 W. Va. 325, 339, 540 S.E.2d 542, 556 (2000). Because the circuit court is the fact finder in abuse and neglect proceedings, an expert witness is not permitted to render credibility determinations in such cases.[19]

Here, Mother vaguely asserts that she required an expert witness to review the children's forensic interviews for "indicia of unreliability, coaching, or other undue influence." While the record is unclear as to the exact reasoning for Mother's request to hire an expert witness, it appears that much of the motivation for seeking expert testimony

---

opinion as to whether the sexual assault was committed by the defendant, as these would improperly and prejudicially invade the province of the jury.").

[19] Other courts have also acknowledged that an expert witness cannot make credibility determinations in a child abuse and neglect proceeding.[19] *See, e.g.*, *In re B.J.*, 735 N.E.2d 1058, 1065 (Ill. App. Ct. 2000) ("[T]rial courts should reject the attempt to use purported expert testimony to bolster or attack a witness' credibility."); *In re Tayler F.*, 958 A.2d 170, 190 (Conn. App. Ct. 2008), *aff'd*, 995 A.2d 611 (Conn. 2010) ("The respondent claims that the court abused its discretion by permitting [the expert witnesses] to testify about the ultimate issue in the case, the children's credibility. We agree with the respondent . . . that the court abused its discretion when it permitted [the expert witnesses] to testify about the children's credibility[.]").

was to attack the credibility of the children's testimony.[20] Throughout the proceedings below, Mother repeatedly indicated that her children had a history of lying and that the children were being coached.[21] As we acknowledged above, an expert witness is not permitted to render credibility determinations in abuse and neglect cases. Accordingly, to the extent that Mother sought to hire an expert witness for the purpose of opining as to the credibility of the children's disclosures during the forensic interviews, the expert witness testimony was improper as it would have invaded the province of the court as the trier of fact.[22]

---

[20] In her motion below, Mother indicated that she required an expert to "form an opinion on the reliability of the investigation and [the forensic] interview[.]"

[21] For example, during the adjudicatory hearing, Mother testified that her children were lying about the allegations against her:

> [Father's Counsel]: Q: . . . The statements your children have
> made do you find any of those statements credible?
> [Mother]: A. No.
> [Father's Counsel]: Q. So is it your opinion that your children
> are not being truthful in their statements?
> [Mother]: A. Yes.

[22] This Court recently found that under different circumstances, allowing an expert witness in an abuse and neglect proceeding to opine as to credibility issues was not error. *In re M.J.*, No. 21-0591, 2022 WL 2135584, at *3 (W. Va. June 14, 2022) (memorandum decision). However, *In re M.J.* is distinguishable from the present matter. We recognized that an abuse and neglect proceeding is conducted through a bench trial and that we "expect[] a circuit court judge who conducts a bench trial to disregard any inadmissible evidence when rendering a decision." *Id.* Additionally, while the circuit court judge noted the credibility testimony in its findings of fact, there was no indication that the circuit court relied on the credibility testimony in making its final decision on adjudication. *Id.* So, while the expert witness provided credibility testimony, there was no error because the circuit court, as the trier of fact, disregarded the inadmissible evidence. Here, there is

20

To the extent that Mother's proposed expert witness would have testified regarding the techniques and form of the forensic interview itself, we similarly find no error under the circumstances of this case. As noted above, the Rules of Evidence allow expert testimony when it will "assist the trier of fact . . . to determine a fact in issue[.]" W. Va. R. Evid. 702. The circuit court, as the trier of fact, exercised its broad discretion to determine that Mother's proffered expert's testimony was not necessary to inform its findings of fact. During the hearing on the motion for Mother's expert witness, the circuit court explained that it was the trier of fact and that the proffered expert witness was not going to be helpful in its decision-making:

> The judge is the finder of fact. We don't have issues where you have to educate me about how to read the demeanor of the child. I watch hundreds of child interviews, hundreds, so I don't see that [this] is going to be helpful to the [c]ourt . . . . It goes outside the reason that we have [forensic] interviews of children to protect them in these proceedings from cross-examination.

The court memorialized this finding in its subsequent order.[23] Significantly, aside from receiving the testimony of the forensic interviewer at the adjudicatory hearing, the circuit court reviewed the forensic interviews itself and conducted its own in camera interviews

---

similarly no error because the circuit court did not allow the inadmissible opinion testimony.

[23] Furthermore, Mother's counsel explored any inconsistencies in and other potential issues regarding the reliability of the children's disclosures through cross-examination of their forensic interviewer.

of D.H. and M.H. In its adjudicatory order, the court noted that it had not only reviewed the forensic interviews at the start of the matter, but also again during the adjudication phase due to Mother's concern that the children were coached. The court found the children's interviews to be credible and that there was "not . . . any evidence of coaching but rather [the] children relay[ed] their first-hand experiences and [were] able to describe with detail what they saw, heard, and felt." Because the court, as the trier of fact, found the proffered expert testimony would not aid its decision, and because the circuit court, as the trier of fact, independently reviewed and conducted its own interviews, we find that the circuit court did not abuse its broad discretion in denying Mother the opportunity to present the testimony of an expert witness regarding the forensic interviews.[24]

### C. Clear and Convincing Evidence

Turning to Mother's third assignment of error, we must examine whether the circuit court erred by finding the respondents proved the allegations of abuse and neglect

---

[24] To the extent Mother contends that circuit court also erred by denying her public funding to hire the expert witness, we disagree. Because we find that the circuit court did not err in denying Mother the opportunity to hire an expert witness for this purpose, we similarly find the court did not err in denying her public funds for this purpose. In addition, to the extent that the forensic interviewer opined on credibility issues during the adjudicatory hearing, Mother has not raised this an error.

by clear and convincing evidence. We conclude that the DHS, Father, and the GAL, presented sufficient evidence to support Mother's adjudication.[25]

In any abuse and neglect proceeding, the allegations set forth in the petition must be proven by clear and convincing evidence:

> (i) ***Findings of the court.*** **—** Where relevant, the court shall consider the efforts of the department to remedy the alleged circumstances. At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the respondent is abusing, neglecting, or, if applicable, a battered parent, all of which shall be incorporated into the order of the court. *The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence*.

W. Va. Code § 49-4-601 (emphasis added). *See also In re C.L.*, 249 W. Va. 95, 102, 894 S.E.2d 877, 884 (2023) ("At the adjudicatory hearing, to have jurisdiction over an abuse and neglect case, the circuit court must find by clear and convincing evidence that the children named in the petition are abused or neglected based upon conditions that existed

---

[25] We acknowledge that this Court has held that the DHS, in an abuse and neglect proceeding is required to "prove conditions existing at the time of the filing of the petition . . . by clear and convincing proof." Syl. pt. 3, in part, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995) (quotations omitted). On appeal, Mother does not argue that the DHS did not satisfy this burden due to its co-petitioner status. Moreover, the DHS participated throughout the entirety of the abuse and neglect proceedings, providing services, attending multidisciplinary team meetings, attending hearings, examining witnesses during hearings, strategizing with the Father and GAL, and seeking to admit exhibits into evidence.

at the time of filing."). "Clear and convincing evidence means that more than a mere scintilla of evidence has been presented to establish the veracity of the allegations of abuse and/or neglect, but it does not impose as exacting an evidentiary burden as criminal proceedings which generally require proof beyond a reasonable doubt." *In re A.M.*, 243 W. Va. 593, 598, 849 S.E.2d 371, 376 (2020). *See also In re F.S.*, 233 W. Va. 538, 546, 759 S.E.2d 769, 777 (2014) (per curiam) ("It is imperative to note that the evidence in an abuse and neglect case does not have to satisfy the stringent standard of beyond a reasonable doubt; the evidence must establish abuse by clear and convincing evidence.").

Mother asserts that the evidence presented "was riddled with inconsistencies, discrepancies, and acknowledged falsehoods" and that the circuit court disregarded each such discrepancy. Yet, as noted above, credibility determinations belong to the trier of fact, the circuit court, which must "weigh[]the credibility of witnesses and render[] findings of fact." *In re Emily B.*, 208 W. Va. at 339, 540 S.E.2d at 556. We are reluctant to disturb such findings, as "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

Prior to the adjudicatory hearing, the circuit court reviewed the children's forensic interviews from November 2021 and July 2022 and held in camera interviews with

24

D.H. and M.H. During the adjudicatory hearing, the court informed the parties of its actions and noted the similarities and consistencies between the forensic interviews and the in camera interviews.[26] Then, the circuit court proceeded to hold several evidentiary hearings and heard testimony from numerous individuals including Mother, D.H.'s therapist, several CPS employees, a forensic interviewer, Father, and D.H and M.H's stepmother. The record contains extensive witness testimony and documentary evidence submitted for the court's consideration, including the forensic interviews and the in camera interviews detailing Mother's threats of physical abuse, actual physical abuse, abuse of substances, failure to care for J.S., and failure to protect the children from abuse by other adults in the home. Therefore, based on the record, we find that the circuit court did not err in finding that the allegations of abuse and neglect had been proven by clear and convincing evidence.

### D. Termination of Mother's Parental Rights

Finally, Mother asserts that the circuit court erred in denying her a post-adjudicatory improvement period and terminating her parental rights. Specifically, Mother argues that the circuit court erroneously found that she refused to acknowledge the

---

[26] The court further indicated that it reviewed the forensic interviews at the beginning of the proceeding and stated that it "viewed them again during the adjudication because of . . . Mother's objection that coaching was present." Ultimately, the court found the children to be credible.

25

existence of a problem when she admitted to failing to protect the children, even though she claimed to be innocent of the other allegations. We disagree.

This Court has consistently explained that the "[f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to . . . abuse and neglect . . ., results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense." *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quotations and citation omitted). In this matter, the record demonstrates that Mother failed to admit to the full scope of abuse and neglect for which she was adjudicated, and which was established by clear and convincing evidence. Furthermore, Mother argued below that her children were liars and unreliable and she maintains the same contentions on appeal. As such, the circuit court did not err by denying Mother's request for a post-adjudicatory improvement period and terminating her parental rights based on Mother's failure to fully acknowledge the extent of her abuse and neglect, which rendered it untreatable.

**IV.**

**CONCLUSION**

For the foregoing reasons, we affirm the circuit court's June 26, 2023 dispositional order terminating Mother's parental rights to D.H., M.H., and J.S.

Affirmed.

26